17-1352. May it please the Court, good morning. My name is D. L. Garr and I represent the Plaintiff Appellate addressing McFarland. Listening to the Court's previous arguments this morning, I think this case is relatively simple, both factually and legally, compared to a number  Ms. McFarland is blind. She's visually impaired, but for practical purposes she's blind. She applied for a position with the City and County of Denver. She wanted to work in a 3-1-1 call center, and that's a job that would have involved the use of computers. So she was invited by the City to come and take a computer skills test that involved three parts, a typing test, an outlook test in terms of email usage, and a test of her internet explorer skills. Ms. McFarland communicated with the City ahead of time, let them know that she was visually impaired, that she was going to need an accommodation for the testing. She requested the accommodation of JAWS. JAWS is a screen reading software that is used by people who are blind and visually impaired. It essentially reads to them what's displayed on the computer screen and provides them with a set of additional keyboard commands to navigate through the computer. The City responded to Ms. McFarland's request for accommodation by saying that they could give her a human reader for the typing portion of the test, and that they would check on the availability of JAWS for the other two parts of the test, the outlook test and the internet explorer test. Ms. McFarland made a number of attempts to follow up with the City before the testing. Those were reflected in emails that are in the record. Ultimately, she got an email back from the test proctor named Lance Dorris, who didn't give her specific information about the accommodation she would receive, but said, you know, come in to test and we'll work it out that morning. Ms. McFarland did come in to test and had the impression that Mr. Dorris thought that she was going to be able to see the computer screen. And she told Mr. Dorris, the test proctor again, you know, I can't see the computer screen. So he proceeded to read to her the various questions on all three of the tests, the typing, the outlook, and the internet explorer. The problem was that especially on the outlook test, over 30 of those questions involved how things looked on the computer monitor. Ms. McFarland had already told the City twice that she couldn't see the computer monitor. So when she navigates through a computer and interacts with it, she uses this adaptive software JAWS. She doesn't use the graphical user interface that we all use. Let me ask you this. The outlook test she passed, correct? She did pass the outlook test. Okay. And it was informational only? That's correct. So the reason she didn't advance was because she failed the internet explorer test, correct? That's correct. And specifically, she failed to get a majority of eight questions on that internet explorer test right. Those were considered the basic questions on the test. And with regards to the internet explorer test, as I understand her testimony, she stated that it didn't, there was no difference for purposes of the questions she missed with whether she had JAWS or she had her human reader because it was the nature of the questions because it was referring to internet five and she was used to internet eight and not, it had nothing to do, she missed the questions she missed because of the difference between software programs and not because they didn't have JAWS. That's correct. She testified that as to those basic questions on the internet explorer test that she missed, that the human reader was effective to let her know what those questions were and for her to select among the answers. And as you say, Did she tell anyone that I'm not, I'm familiar with internet explorer eight but not with internet five or ask them what version they were using? She did not, Your Honor. And she, she was the ignorant party during this testing. She didn't know coming into it exactly how it would be presented. And the city understandably keeps these things close to the vest so it gets objective test results for people. So she didn't know what the test would cover. She didn't know that Outlook was informational only. She didn't know that only eight of the questions out of 24 on the internet explorer test actually created this hurdle for her to progress in the testing process. All she knew is she was given over 100 questions and over 30 of those involved how things looked on the computer screen. And she had been asked over 30 questions about how things looked on the computer screen for over an hour before she got to the Internet Explorer exam. So it's almost and I'm not saying the city intended it this way for a minute, but it was almost a hazing process. It's almost as if the panel today were to ask me a third of the questions that you present were about Chinese characters. And I don't know Chinese. I can't read Chinese characters and they're not really related to the case. But if I had to go through that before I could present the rest of the argument, it would be incredibly disconcerting. The questions were irrelevant. It would still be useful in determining whether or not to hire the applicant. It was just that your answers, incorrect answers wouldn't disqualify you. Isn't that correct? And you're referring to the Outlook test? Yes, that's exactly right. They would be used. They could be used by the hiring manager later on in the process. It didn't create a hurdle to advance to the next stage of the hiring process, but they could be considered. So they weren't unimportant. Well, if we started asking you questions in Chinese, assuming I hypothetically learned Chinese, wouldn't you have to say, hey, I don't speak Chinese? If I had. Well, yes, Your Honor. But if I had told you at the outset, you know, I don't speak Chinese, I don't read Chinese. And the case had nothing to do with Chinese. There would be no reason for you to ask me questions about Chinese characters. And if I had told you twice, you know, I don't read Chinese. And you persisted in asking those. At some point, Your Honor, out of deference and out of desire to move the process ahead, I might just knuckle down and try to do the best I could. And that's essentially what Ms. McFarland did here. She had told the city twice, I don't see a computer screen. I can't see a computer screen. Yet they persisted in asking her questions about how things looked on the computer screen. And she just she did her best. But they gave her a reader, someone who could describe the screen for her. They did, Your Honor. So on its face, that would seem to be a reasonable way of proceeding. And at that point, if it's not, if there's something still missing, doesn't the interactive process require her to say this isn't working? I'm used to another way of having the screen described. The JAWS program works for me. You're not you're not the equivalent. Wouldn't she have to say something like that? Your Honor, I think that is a would have been a reasonable way to proceed on the review of this order granting summary judgment. It's a question of whether there's a jury question here, a factual dispute that is deserving of the jury's consideration. And our position is that when she told the city twice that she can't see and she's before, she said both both of those were before she was provided a reader. That's correct, Your Honor. But the the reader is not helpful to her in terms of understanding what it means when something is shaded or when something is presented with a cross out text or when something is JAWS would JAWS JAWS is a remarkable piece of software. Yes. Yes. JAWS would. But did she say that? Did she explain that what you're doing is not adequate for my needs? Not on the day of the testing, Your Honor. Not until she sued. Well, correct. And that's right. She she told the city when she arranged for the testing that she couldn't see the computer screen. And on the morning of the testing, she said again, I can't see the computer screen. And then the city asked her questions about how she would navigate a computer using a graphical user interface, which she never uses and wouldn't have used in the job for what she applied. But she didn't stop and say, you know what, this reader isn't working because I can't see. Now, one question first. Are those questions that were problematic for her? Were those the ones that were relevant to determine whether she passed this stage? The questions about the outlook question, the questions that were most problematic about what things looked like, what icons you would click on, what red color meant. Those were on the outlook test, which was informational only. And Judge McHugh referred to this earlier, the eight questions on the Internet Explorer, basic part of the test that that bumped her out of moving forward in the consideration process. The reader was the reader worked for those. The problem was she was already over an hour into the process and stressed and exhausted by the time she got there. And then there was this problem with different versions of Internet Explorer. And and she didn't she didn't have any idea what version she was being tested on. When we look at the A.D.A. as whether it was version five, version eight, it doesn't relate in any way to the site issue. Well, she was not able to have the clues that a visual person might have as to what version they were in. She simply assumed that the keyboard commands that she was used to using in Internet Explorer would work in this setting. She never got any feedback during the test that she was missing these questions. She simply wasn't alerted to the version issue. And again, it's not to be critical. I know there are budget issues involved, but the test was in 2012 Internet Explorer eight, which she was used to using to come out in 2009. Internet Explorer five was being used on the test. And it was I don't want to say it's obsolete, but it was a dated piece of software. And she simply didn't know she was being dated or being tested on something so dated. But the expression interactive process, regardless of the authorities or the precedent, inherently means there needs to be interaction. And I just don't see any interaction that helps her on this interactive process. So help me. Your Honor, most of the cases that have resolved this interactive process, breakdown issue on summary judgment, have involved situations where a current employee walked off the job before the accommodations were put in place and given a fair try, or situations where an employee failed to provide medical records that were requested by the employer. Those are situations where the employee really has obstructed identifying a reasonable accommodation. Ms. McFarland here did the right thing. She disclosed her disability. She asked for an accommodation. She suggested an accommodation. She called to follow up. She again identified her disability on the day of the testing. But when she did notice that it makes a difference, you know, when she didn't get the position or didn't advance in the process, that's the time that interaction was necessary. Your Honor, and I just submit that that's a factual question for a jury, whether what she did was reasonable. Some of the cases that she didn't do anything. That's the problem. She did nothing until the lawsuit. She did nothing between the time she told the test proctor on the morning of the exam, I can't see, until she filed the EEOC charge. May I ask a question about your other? You also had a most effective manner claim. Is that correct? Yes. Does that require an interactive process? Your Honor, this is the first case that I've ever encountered or seen reported where the interactive process is grafted onto the most effective manner to ensure fair testing. Well, who grafted it on? The district court judge in this case. The judge resolved that one, the most effective manner, because of the failure of the interactive process. Is that correct? The trial court granted summary judgment and said that the failure of the interactive process, which she attributed to the plaintiff, Ms. McFarland, also defeated the testing provisions of the ADA, the most effective manner to ensure. Did you argue that that was an improper analysis? Did you say that the interactive process does not apply to that claim? Your Honor, we presented the claim, and we were, frankly, surprised by the interactive process ruling. We had argued it on other grounds, and the court resolved it on an interactive process failure. Well, I assume that the defendants argued interactive process was required even for the most effective manner claim. Is that correct? Yes, I believe it was, Your Honor. And how did you respond when they raised that as a defense to the most effective manner claim? If I'm recalling correctly, Your Honor, that was raised in the reply brief. We simply asserted the most effective manner claim in our briefing, but I don't believe we did squarely address the interactive process issue. Because it wasn't raised until the reply brief. Correct. Correct. Will you indulge me? Yes, I will. So if there is a stand-alone claim under the ADA for failure to have the most effective test, how do you view that? Is that a strict liability violation? For example, sure, her complaint is that the nature of the questions themselves were not designed to see that you tested her on her abilities rather than her disability. Right? Yes. Okay. So it has nothing to do with JAWS or Reader. It's the nature of the questions. And my question to you is, what are the elements of such a claim? Do you have to show that the employer knew that the questions were not adequately separating out the person's ability to do the job from their disability? Does the employer have to have an intent to discriminate? Or does the employee have an obligation to engage in the interactive process? Your Honor, these are novel questions. I think these issues are a first impression. Unless it's strict liability, unless you need to show nothing other than the question by its nature doesn't work with a person who is not sighted, then your claim would fail. Right? Your Honor, I think the elements of the claim should be that the employer has to know what the disability is. Otherwise, there's no way for it to evaluate whether it's testing the most effective process. And here the employer did. The employer also has to know what the questions are on the test. And this is the employer's own test, so the employer would have known that they included all these questions about the graphical user interface. So if the employer knows of the disability and knows of the questions on the test, and the test is still testing the disability and not how the job will be performed, then I believe, Your Honor, that those are the elements to establish the claim. So you don't have to show that the employer knew that the question itself was problematic for a particular disability. Your Honor, I think that that would be inferred from the fact that, in this case, Ms. McFarland is blind, doesn't use a graphical user interface, and these questions are about how things look on a graphical user interface. And is it constructive knowledge, or do we have to say that somebody looked at the question, knew she was blind, and gave it to her anyway? Your Honor, I think knowledge can be inferred in terms of whether it's actual or constructive. I don't know the answer to that question. And if she's in the test and she's reading, and she's having a reader read it to her, and it's apparent to her that the nature of the question is impossible for her to answer because she's never seen a computer screen, this particular type of computer screen, she has no obligation to call the tester's attention to that fact and request that the question be modified. Your Honor, I simply submit that that's a factual question for the jury because she did... Isn't that a legal question about what the elements of the claim are? She identified that she was blind and that she needed adaptive software to use a computer, and I simply submit that the disclosure that she's blind carries with it the implication that she can't see what's on a computer screen, including these graphical cues that most of us use to navigate a computer. Thank you. Thank you, Your Honor. Good morning. May it please the Court. Counsel. I'd like to... First, I'm sorry. I'm Jessica Allen, and I represent the city and county of Denver. I'd like to start with the questions that Judge Hartz and Judge McHugh have been asking about, which relate to issues that were brought up only on the appeal. And it's this issue of whether or not most... Before... Yes, sir. On the most effective manner? Yes, sir. Before you get there, procedurally, was that issue first raised in the district court in a brief they didn't have an opportunity to respond to? Yes, Your Honor. It was brought by the appellant in the reply brief for the first time, and therefore the city did not have the opportunity to respond to that argument. Wait, wait, wait. Didn't you file the most... You filed the reply brief, so they could have an opportunity. I thought the situation was they... You brought a motion for summary judgment. Yes, sir. They responded saying... Yes, sir. ...they are not entitled to summary judgment because we have this most effective manner claim. Test, yes, sir. And your reply was, that's also subject to the requirement of having an interactive process. And so they had no opportunity to say, no, interactive process is not required for the most effective manner claim. I apologize. I misunderstood your question. I'm sorry. That's where it's going. Judge Murphy, my apologies. I misunderstood the question. You filed the reply brief. Yes, sir. We did. Yes, sir. I'm sorry that I misunderstood the question. So the question, did we raise it for the first time in the reply in terms of that being the standard? Your Honor, I don't believe so, because in our brief we would have said that the court was required to look at both the standards and the courts required to look at the failure to accommodate issue and that those two things are one and the same. And, in fact, that would be one of the points I'd want to make with Judge McHugh, which is that this whole tortured reading of the test and do we have to come up with a whole new legal standard, none of that is the case because, in fact, we have CFRs that interpret this statute. 29 CFR Part 1630, and it's 1630.11, specifically says, read together with the reasonable accommodation requirement of Section 16.9, the provision requires that tests be administered to eligible applicants. And so it says in the guidance, it says in the guidance that you don't just look, as Judge McHugh is asking, you don't just look independently and say, is the requirement under 12.112b7, its own independent test, do you look at it separately from the reasonable accommodation issue? The answer to that is no. Well, then what does it add? It adds that you look at that test in conjunction with the reasonable accommodation. Well, I don't see what, under your reading of b7, then the person taking the test who has a disability would say, wait, this is not testing my abilities, this is testing my disability, and now you need to accommodate me. That's how it would come up under 5b, I think it is. What does 7 add? 7, Your Honor, I believe 7 adds that in conjunction with, what 7 says is that you have to select and give the test in the most effective manner. But you have to read it in conjunction with the reasonable accommodation. You can't just look at it as, is it just the most effective way to give a test, or do we select the best test? Have we also given it such that it shows what her skills are? Basically, Your Honor, we need to put an applicant in the same standing, if you will, we need to give them the same opportunity that we give someone who doesn't have a disability. And that's exactly what we've done here. I don't believe you look at b7 in a vacuum. And you say there's some guidance with respect to b7? Yes, sir. And it says what, then? It says that you read together, you read together section 5 and 7. Where does it say that? Can you quote from that? Yes, sir. It's 29 CFR part 1630.11. It's the interpretive guideline on Title I of the ADA. And it says? And it says that you read together with the reasonable accommodation requirement of section 1630.9. This provision requires that employment tests be administered to eligible applicants or employees with disabilities that impair sensory, manual, or speaking skills in formats that do not require the use of the impaired skill. It doesn't explicitly refer to interactive process. But then neither does reasonable accommodation. Well, it does. But it does. It keeps reading, doesn't it? Yes, ma'am. But it's a little different than our situation because it uses an example of where a blind person has a special lens and thinks they don't need accommodation because they can magnify enough to read the test. The applicant gets into the test and the lens isn't good enough. And then it says that the individual would then have be appropriate for them to say this test isn't working for me and then the employer would have an obligation to accommodate. That's exactly right, Your Honor. And that's what should have happened here and did not happen here. As I hear their argument, if I'm understanding it correctly, is it's not that situation. It's not one where the person with the disability decided I don't need an accommodation. I'm just going to bring in my lens. This is a case where the person said I do need an accommodation. And what I think that they're saying is then the burden is you on the employer to look at their test and make sure that there aren't obvious problems with the test that would trip up a person who can't see. I think that's the argument they're making. But that argument isn't supported anywhere, Your Honor, that we have that an employer would have then a new separate duty to go look at the test and figure out what works best for that specific applicant. It's an informal process and the employer has a duty to give a reasonable accommodation. It doesn't have to be the specific one that they ask. But we're not in reasonable. I mean, that's what's so odd is that, as Judge Hartz was pointing out, is the definition of disability has two separate definitions. One is failure to accommodate, which is 5, sub 5. And then it has failure to choose the best test or a fair appraising. We know what you mean. And so if they're going to have to, I mean, why would you need 7 if it just means accommodate reasonably? I mean, it would be a reasonable accommodation if somebody says in the middle of the test, my lens isn't working, to figure out another way to do it with or without sub 7. I think that what sub 7 does is it just ensures that, what the skills that are necessary for the applicant. And so this test failed that because it referred to things such as the background on the screen, which is not necessary for the job and a blind person would never have to deal with shading or whatever it is. I might be getting my facts way off, but I hope the point is clear. And so therefore, once you know you have a blind applicant, you need to look at your test and say, well, this person at the call center is never going to look at a screen. So these questions can only be testing her disability, not her ability to do the job. And that's my question is, maybe that's not true. Maybe the test is fine, but it doesn't have an interactive process requirement. So I have a couple of responses, Your Honor. The first is going back to your Chinese example. In this case, we are testing the ability to read Chinese. In this case, we are testing the ability to use the computer programs. And so we don't, the test itself doesn't fail any requirements because she's got, she needs to be able to take the, to be able to use the computer. In order to be qualified for this job, she's got to be able to show that she can use Outlook and that she can use Internet Explorer, that she speaks Chinese. See, I, okay, this is a factual misunderstanding on my part because I thought that what opposing counsel said is when a blind person is working in the call center, the blind person doesn't have to know screen shading and things like that, that are asked in the Outlook questions on the test. So in fact, it is testing things that she doesn't need to know because if she's blind, she's going to be doing this job a different way from the way sighted people would be doing. That's exactly right. And I think you mentioned earlier, Your Honor. That's right. Well, then that virtue does enough. What? Perhaps I've become confused around the maypole, Your Honor. I may be, I'm probably the one confused, but let me take a moment then to try to make it clearer. Yes, Your Honor. Maybe I'll just be repeating myself. I thought what he said was that there are elements of the test on Outlook that ask you about the appearance of a screen. But if a blind person was working at the call center, they would be using, that person would be using a different system and would never have to know what the appearance of the screen was. So to the extent that this Outlook part of the test is asking questions relating to the appearance of the screen, it's asking questions that a blind person would not have to deal with at the job and which are very difficult for a blind person. So you're not testing ability, you're testing the disability. Was I any clearer this time? You were very clear, Your Honor. And I think the factual difference between your understanding of the argument and my understanding of what he argued is that, I believe what he argued is that even if she worked in the call center with this program, this JAWS program that she wants, it would simply read to her what's on the screen. It would do exactly what the human reader did. And so to the extent that, so if, I'm sorry if I'm not answering your question, Your Honor. So if she were in the call center, she would have to know what the screen looked like. She would not have a different system for dealing with people calling in. Yes, and the allegation is that the program would do that for her. But yes, she would need to use Outlook and Explore just as a sighted person would. But she doesn't have JAWS. Well, if she was hired, she wouldn't have JAWS. And she needs JAWS to do that. Well, that's what your answer indicates. I'm sorry that I don't understand your question, Your Honor. Because what she would have had, had she been in, had she gotten the job, that's outside the scope of this case. And there's no, although there was some testimony from her expert that he would have gotten JAWS, or that JAWS could potentially work in this situation, there was no evidence, we didn't talk about. I'm sorry that I'm not understanding your question. Judge Hart's question to me was, she was disqualified for this job, working on this computer, because she was sight impaired. Period. Is that your answer? No, she was disqualified for this job because she couldn't pass the test that would have qualified her to be qualified for the test. She didn't have the correct computer skills. And that was because she was sight impaired. I'm sorry? And that was because she was sight impaired. That's why she didn't pass. She didn't, no. I'm sorry, then I've misstated the answers to the questions then. No. She didn't pass the test because she got the answers wrong on the test. On the Internet Explorer. Correct. Because she didn't know that software version. She was answering for Explorer 8 and you were using Explorer 5. According to her, yes, Your Honor. Okay. Yes. And the questions she missed because she couldn't see a computer screen were on the Outlook test, which didn't fail her. Right, which, that's right, which in fact she passed. Which in fact she passed. Okay. Going back to, I'm sorry to keep harping on this, 42 U.S.C. 12112B, 7, it says failing to select and administer tests, blah, blah, blah. So, that suggests to me that there's two obligations. One is the administration, which if you're giving her the test and she says there's a problem, you have an obligation to rethink it. But there's also this obligation to select. And that's the one where I'm having a little more trouble about what is required. Is it that every time someone who says I need an accommodation, whether it be that they have a hearing issue or a vision issue or they're not ambulatory or whatever it is that you have to accommodate, is that an independent obligation on the employer to then go and look at the test, knowing what the particular disability is, and to select the test that is the most, that will best test their ability to do the job and not their disability? No, Your Honor. I do not believe that it imposes that require on employers. And I believe that that's the reason. In support of that, you look back to Section 5 and the reasonable accommodation portion. I think that's why you read them together. That's why the language of the CFR says you read them together, so that if an employer has a test and someone comes in and they're missing an arm or a leg or they're deaf or they're blind, then we figure out what reasonable accommodation will be necessary to ensure that they can best complete, that they can complete that test. And, you know, the guidance that you're looking at. Yes, ma'am. I read that Part 2 and I thought, oh, you read them together, but then I kept reading. And you look at the defenses section, and when they're listing the defenses, they put Section 163011, which is our failure to select and administer tests, in the disparate treatment section, and specifically do not list it in the making reasonable accommodation section. So for me, it was as clear as mud. And perhaps it is, Your Honor, but I think that this is what – I'm sorry, I'm actually over time. May I finish this thought? Yes. This is what distinguishes Title I versus Title III. Plaintiff urges you to accept the standard under Title III, which does not incorporate a reasonable accommodation standard and where you solely look at the testing itself. But courts have distinguished that standard. They've distinguished the Ninth Circuit in the Engert case, distinguished that situation under Title III versus what we have here in Title I. And so, based on that, I do believe that you read them together. And, in fact, that's what the Ninth Circuit said in Engert. Thank you. Thank you, Your Honor. I'm going to give you a minute if you think you can. Well, thank you, Your Honor. The main thing I'd like to use this time for is to answer any further questions that you have, but I think there are two points that I would like to respond to. One is that B-5 and B-7 create separate duties. One is a duty to reasonably accommodate. The other one is to select and administer tests to best ensure that they measure abilities rather than disabilities. To the extent that the test did not satisfy B-7, that was just in the overlook portion of the test, though, was it not? I thought your only argument about how it affected her passing the second part was that she was just tired and worn out because the first part was harder than it should have been. Well, there was also this problem with the scoring based on Internet Explorer 5 versus 8. Yeah, but that had nothing to do with her sightedness. Pardon me? That had nothing to do with her sightedness. Well, except that she didn't have any visual cues as to what she was working with. She was simply giving the commands in a vacuum. She had a human reader sitting there, right? Yes, she did, Your Honor. She could have said, boy, this is sounding odd. What version are we on? There's nothing about the question that would clue you to the version. The only way the version becomes an issue is what answer is correct. And she was giving answers that would be correct in the Internet Explorer 8 that were wrong in 5. She didn't have the context. In one sentence, what was your second point? It's just that she would not operate a computer if she were hired in the same way a sighted person would. She would never have to know about screen colors. She wouldn't have to know about fonts, et cetera. And that's because of JAWS? That's because of JAWS, which not only reads screens, but it reads tags that are hidden behind icons. And it also includes keyboard shortcuts so that a blind person can navigate a computer in a call center remarkably well using JAWS without seeing anything on the screen. She does the job entirely differently. Does the record indicate when it was she determined that they were using version 5 versus version 8? That became apparent when the test results were produced during discovery, during the lawsuit. So you're telling me that it was not until after the lawsuit was filed that it became apparent that the distinction between 5 and 8 would not be known by a person who was sight challenged? That's correct, Your Honor. And if I might add just very briefly, this Alt-A versus Control-I issue that makes the 5 versus 8 significant, that wasn't discovered until after Ms. McFarland was deposed during a plaintiff's expert's deposition. Thank you. Thank you very much. The case is submitted. Counsel are excused. And I need to say something. I really like this argument because I thought counsel were very candid, very informed about the record. It was enjoyable as a judge to hear this argument, and I'd like to thank both counsel.